1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JULIA GRACE LILKENDEY, Plaintiff,

vs.

The State of New York, The New York State Senate,
Joint Commission On Public Ethics, Andrea Stewart-
Cousins, Shelley Mayer, Alejandra Paulino, Shontell
Smith, Seth Agata, Dawn Harrington, Frank Patience,
Defendants

------------------------------------------------------

Plaintiff demands a trial by JURY

Civil Case No. **1:21-cv-1355**
(Judge's initials)  **(GTS/DJS)**
CIVIL RIGHTS COMPLAINT
PURSUANT TO
42 U.S.C. §1983



U.S. DISTRICT COURT - N.D. OF N.Y.
FILED

DEC 20 2021

AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

## JURISDICTION

This is a civil action seeking relief and/or damages to defend and protect the rights guaranteed by the
Constitution of the United States. This action is brought pursuant to 42 U.S.C. § 1983. The Court has
jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4) and 2201.

## PARTIES

Plaintiff: Julia Grace Lilkendey

Address: 211 Consaul Road Colonie, NY 12205

Defendant: The State of New York

Address:  Albany, NY

Defendant: New York State Senate

Address:   The Capitol, Albany NY

Defendant: Joint Commission On Public Ethics

Address: possibly 540 Broadway Albany, NY


Defendant: Senator Andrea Stewart Cousins, Senate Majority Leader from 2019 to

present

Address: NY Senate Capitol Room 330


Defendant: Shelley Mayer, State Senator from Westchester from April 2018 to present


Address: Legislative Office Building Room 509


Defendant: Alejandra Paulino, Secretary of the Senate 2019 to present


Address: Secretary of the Senate's office in the Capitol


Defendant: Shontell Smith, Chief of Staff to Senator Andrea Stewart-Cousins and Chief

Counsel for the New York Senate Majority Conference

Address: Capitol building


Defendant: Seth Agata, Executive Director of the state Joint Commission on Public

Ethics from March 2016 through approximately June 2019

Address: unknown

Defendant: Dawn Harrington, Director of Human Resources from 2011 through 2018

Address:

Defendant: Frank Patience, Secretary of Senate from 2011 through 2018

Address:

## FACTS

1. The Plaintiff's civil and Constitutional rights were violated in numerous ways while working for the New York State Senate. She was ignored, terrorized, and retaliated against for her protected activity of opposing sexual advances from her boss and complaining to senate authorities about severe and pervasive harassment, intimidation, and a hostile work environment.

2. Instead of addressing the Plaintiff's complaints and preventing further sexual harassment, stalking, and emotional anguish, senate authorities in positions of power -- Defendant Shelley Mayer, Defendant Frank Patience, Defendant Dawn Harrington, Angelo Aponte, and Mary K. Berger aided and abetted sexual deviant Carlos Gonzalez (son of Senator Efrain Gonzalez) who continued to threaten the Plaintiff, subjecting her to further emotional distress and trauma to which the effects resurface almost daily.

3. The senate's failure to investigate claims by the Plaintiff and other senate employees was reckless and intentional. It deters victims from reporting sexual

harassment and other forms of hostility at work. Not only does it provide for a culture of abuse, it also lays a heavy mental burden on those who seek help and don't get it.

4. Because Defendant Senate Leader Andrea Stewart-Cousins is not consistent with her message, when she puts politics before the safety of employees, she puts people in vulnerable positions in more danger.

5. In April 2018, the Plaintiff spoke to a reporter about a personal matter that was of public importance during the Me Too movement. She was immediately slandered and discriminated against and on December 20, 2018 was terminated from the New York State Senate where she worked for nearly 14 years.

6. The act of firing the Plaintiff was a message to victims that you only stay safe if you stay silent. When the Plaintiff was "silent" she was safe.

7. After the Plaintiff spoke out to Ken Lovett of The Daily News about the discrimination, harassment and neglect she faced at the senate, she was treated differently at her job by Defendant Andrea Stewart-Cousins and then fired under the direction of Defendant Andrea Stewart-Cousins by the incoming Secretary of the Senate Alejandra Paulino

8. Leading up to the termination of her employment, the plaintiff was told she had an X on her back and that she was on a list to be fired once the new

administration was in charge because the Plaintiff implicated a member of the
incoming senate majority conference, Defendant Shelley Mayer, for not
protecting the Plaintiff and other senate employees from mentally and physically
abusive bosses in 2010 when Shelley Mayer was the Chief Senate Counsel.

9.  The Plaintiff has no political ties. Prior to her career at the senate she was a
    news producer in Hartford, CT. The Plaintiff started working in the Senate
    Majority Press Office in 2005 and was the liaison to the Media Services
    Department. In 2009, the senate administration shifted from Republican to
    Democrat. While the Democrats took control under the leadership of Senate
    Majority Leader Malcolm Smith, the Plaintiff was promoted to Deputy Director of
    Media Services - a role she kept through the rest of her time at the senate.

10. The Plaintiff worked as Deputy for three different Media Directors. She was a
    valued and high performance reviewed employee and was known to have great
    working relationships with senators and their staff of both administrations.

11. The Plaintiff was a steadfast and diligent employee even under the threat of an
    abusive boss with no protection from senate administration, or law enforcement
    when she made complaints from the years of 2010-2016.

12. On April 12, 2018 Defendant The State of New York, led by Governor Cuomo
    enacted what Cuomo called, the strongest sexual harassment laws in the nation.

The new state law stated protections from retaliation against individuals that complain of sexual harassment or who testify or assist in any proceeding is unlawful. Governor Cuomo was calling on an investigation into the sexual harassment allegations into Senator Jeff Klein, he said NY had zero tolerance for any of it. Yet he ran to rally for Defendant Shelley Mayer who was running for a special election senate seat after the Plaintiff  spoke up about Defendant Shelley Mayer as an enabler of my abuser who was a senator's son.

13. The Plaintiff was fired on December 20, 2018 for publicly making statements about a matter of public importance and for filing a formal complaint to call for an investigation with the Joint Commission On Public Ethics in April 2018.

14. This complaint sets forth the claim that the Plaintiff was conspired against and retaliated against by Defendants: The New York State Senate, Senate Leader Andrea Stewart-Cousins, Senator Shelley Mayer, Secretary of the Senate Alejandra Paulino, and Chief Counsel Shontell Smith, Executive Director of the state Joint Commission on Public Ethics Seth Agata, and the Joint Commission on Public Ethics.

15. Defendant Frank Patience, Secretary of the Senate from 2011-2018 and Defendant Dawn Harrington, HR Director from 2011-2018 both knew what was happening to the Plaintiff the entire span they held those positions of power. The Plaintiff believes the highest ranked person in the senate, Defendant Frank

Patience, could have made it clear how serious of a matter it would be to fire her due to the grave details he knew that happened to her.

16. The Plaintiff also believes that Defendant HR Director Dawn Harrington also had a responsibility to protect her. Defendant HR Director Dawn Harrington heard it straight from the Plaintiff that the Plaintiff was grabbed by Carlos Gonzalez in the Legislative Office Building in 2011 after he heard I reported him and telling me it isn't fucking over. That should have never been disclosed to him. Defendant HR Director Dawn Harrington knew the Plaintiff  filed a report with the state police, that she made several valid complaints to the senate, HR had the report about the IP address that was captured, that my therapist wrote me a note dismissing me from watching the first mandated sexual harassment training due to triggers, HR had the paperwork for my doctor mandated medical leave, and she knew the Plaintiff spoke to a reporter. The Plaintiff believes Defendant HR Director Dawn Harrington should have the duty to enforce my protected right to speak about the violations of my civil rights. As the director of Human Resources it's her role to protect workers in vulnerable positions.

17. It's important to know the background of what happened during the time the Plaintiff was originally speaking out, in order to understand the severe and pervasive abuse and neglect she faced.

18. In 2009, the Senate hired Senator Efrain Gonzalez's son, Carlos Gonzalez as the Director of Media Services | Creative Services. As the Plaintiff's direct boss, Carlos Gonzalez created a hostile work environment, sexually harassed and stalked her, threatened her job, asked her to sex parties he disguised as business networking parties, wrote her poems, demeaned her in front of coworkers and would lay into her when he couldn't control her outside of work. Carlos Gonzalez threatened work retaliation for not accepting his advances.

19. The Plaintiff became anxious as a way of living and was on edge every day. Her dentist asked if she had been under a lot of stress because he could see she was grinding her teeth. Due to this, in September of 2009 her upper right needed to be fixed and a month later he fixed her upper left. And by November of 2010, the Plaintiff had broken off the work that was done on the upper right and it had to be fixed again. The Plaintiff purchased numerous night guards, but would chew right through them.

20. In 2010, the Plaintiff started saving texts, emails, and eventually audio recordings. Her boss, Carlos Gonzalez's actions turned more devious. He was relentless about the sex parties and would lash out that she would never go and treated it as if she wasn't fulfilling an aspect of her job. So he started scheduling out-of-town trips to make videos in senate districts with different configurations where Gonzalez and the Plaintiff would have to stay overnight in hotels. The

███████████████████████████████ Carlos Gonzalez told her on

numerous occasions that he was protected and she was not.

21. The Plaintiff understood that it wasn't just a threat, but it was true. She
    understood it wasn't going to be the typical her word against his argument --which
    was hard enough, but what really was at play was even harder -- his connections
    against her connections. She was humiliated and withdrew. Her survival tactic
    was to push down and ignore things that happened. By the fall of this year he had
    creeped into every aspect of her life and was threatening her.

22. Director of Production Matthew Kulvicki witnessed Carlos Gonzalez harassing
    and being inappropriate with the Plaintiff and the other employees in the office.

23. The Plaintiff confided in her coworker Matt Kulvicki about the basics of her
    harassment experiences and he told the Director of Creative Services Chris
    Sealey, who was the direct boss over the Plaintiff and her boss Carlos Gonzalez.

24. From this point on, any time the Plaintiff tried to get help, her boss Carlos
    Gonzalez would find out and would come at her with threats. Carlos Gonzalez
    would yell at her, call at all hours, attempt to reschedule video shoots so he could
    go on trips with the Plaintiff, or cancel video shoots stating video wasn't needed
    but would turn around and send other people instead, he was making demands,
    and threatening her job. She was terrified for her life and that of her young son's.

25. October 26, 2010 The Plaintiff was told by Carlos Gonzalez that she was being

    moved out of the office, not because of her work which he called excellent, but

    because she couldn't give him what he needed as the number two of his office.

    He admitted that he had "unorthodox or unrealistic expectations" of how he was

    to be with the Plaintiff. He told the Plaintiff that the Secretary of the Senate

    Angelo Aponte's second in command, Mary K. Berger, cleared that it was best

    that I be moved out of Media Services.


26. The Plaintiff asked the Director of Creative Services Chris Sealey and Director of

    Production Matthew Kulvicki if this was really happening. Chris Sealey

    approached Mary K. Berger in confidence and she told them it wasn't true. After

    that Mary K. Berger also told Carlos the Plaintiff was seeking help — and he

    made two of the Plaintiff's coworkers drive her from Ogdensburg where they

    were campaigning to his hotel in Watertown to shake the Plaintiff down.


27. The next day, October 27, the Plaintiff's professional title was taken off of her

    senate email signature.


28. October 28, 2010 Director of Creative Services Chris Sealey and Director of

    Production Matthew Kulvicki met with Defendant Chief Senate Counsel Shelley

    Mayer in confidence about the torment the Plaintiff was under. They told

    Defendant Counsel Shelley Mayer the Plaintiff was in an intimidating, hostile and

    abusive situation at work and felt she had no one to go to with this because her

boss, Carlos Gonzalez was family friends with the Secretary of the Senate
Angelo Aponte who had proven to protect Carlos Gonzalez and would give
Carlos warnings when she tried to get help. Defendant Shelley Mayer told Chris
Sealey and Matthew Kulvicki to tell the Plaintiff to wait until after the election
(which was November 2).

29. Right after Defendant Counsel Mayer, Matthew Kulvicki, and Chris Sealey met on
October 28, 2010, Carlos Gonzalez was informed about it.

30. Carlos Gonzalez called the Plaintiff threatening that someone was going to be
fired and that she was in trouble with Secretary of Senate Aponte for something
she said. The Plaintiff recorded the conversation. Gonzalez ended the call saying
he would fix it and protect the Plaintiff and himself. The Plaintiff told Matt Kulvicki
that she was terrified and this is why she never felt safe coming forward. He told
her she would be ok, but he wasn't there to see what was happening to her. For
the next week or so the Plaintiff was left to fend for herself.

31. October 31, 2018 Carlos Gonzalez said the conference wanted to see the
Plaintiff's credit card statements and phone records. He would be freakishly evil
one minute and then creepily nice the next.

32. The Plaintiff had a plan to meet the Director of Creative Services in his Capitol office on November 4. It was after the election, the Plaintiff thought everything was going to be dealt with.

33. The night of November 3, the Plaintiff's boss Carlos Gonzalez emailed and texted the Plaintiff's that he gave staff the next two days off (Thurs. and Friday) and not to come in, but if the Plaintiff does, he told her she would have to contact him first. The Plaintiff didn't contact her boss, but she did go to The Capitol to meet with Chris Sealey.

34. Chris Sealey was leaving his position at the senate and he told the Plaintiff that Defendant Chief Counsel Shelley Mayer knew he was meeting with the Plaintiff that Defendant Chief Counsel Shelley Mayer was someone the Plaintiff could go to for help.

35. While the Plaintiff was in his office Carlos called her seven times demanding she call him saying he knew she was in the building. It frightened the Plaintiff that someone so blatantly disregarded her safety and tipped him off that she was there.

36. The Plaintiff learned she could not trust the words of people at the senate so she closely observed and followed their patterns. If the last time Chris Sealey talked to Defendant Chief Counsel Shelley Mayer in confidence, Carlos called the Plaintiff frantically already knowing she was seeking help, the Plaintiff deducted

that it could have been Defendant Chief Counsel Shelley Mayer who told Carlos

Gonzalez again. The Plaintiff felt she couldn't trust that avenue and was left in a

terrible position that froze her in fear.

37. The Plaintiff didn't return her boss' calls right away, so he had other people from

her office call her. When she called Carlos Gonzalez back he said he was making

everyone in the office come in to work on Friday because she wouldn't get back

to him and we were having an emergency meeting per Special Assistant to the

Secretary of the Senate Mary K. Berger, he said.

38. The Plaintiff told him she was visiting friends in Connecticut with her son because

he gave her the time off. Her boss told her that comp time does not include out of

town travel and there were no exceptions for anyone about missing the meeting.

39. The Plaintiff came in to work, and recorded the meeting which was bogus and

nothing of importance. Carlos Gonzalez bragged about his campaigning skills,

even though the race he was on lost, and the office chose dates for a

Thanksgiving party (that wound up being canceled) and a Christmas party (that

would end up being rescheduled).

40. The Plaintiff also recorded the one-on-one conversation he had with her behind

closed doors where he was shaking her down about what she told people about

him. This was the real reason he wanted the "emergency meeting."

41. A few election results were undecided — and no-one provided any relief for the Plaintiff during the time the ballots were being counted.

42. On November 9, the Plaintiff's coworker Matthew Kulvicki went back to Defendant Chief Counsel Shelley Mayer about the fact that she was still dealing with a monster. Senate photographer Shana Wittenwyler, who also made complaints about her boss as well as mine too, also went back to Defendant Chief Counsel Shelley Mayer.

43. Defendant Chief Counsel Shelley Mayer said that there would be investigations in both media services and photography, but that never happened. Secretary of the Senate Angelo Aponte retired early from his position in November. And Defendant Chief Counsel Shelley Mayer dropped the ball.

44. In December, the Plaintiff thought incoming Director of Communications Kelly Cummings would be able to keep her boss Carlos Gonzalez away from her and Kelly Cummings really seemed to want to at first, but she rescheduled a meeting with me and then canceled saying she wasn't in charge yet. Again, the Plaintiff was left to handle trauma on her own.

45. In 2011, Carlos wasn't fired or held accountable, but he was eventually let off the payroll in about the third round of cuts.

46. He stuck around the Capitol, knew the Plaintiff's schedule and would just show up for two full years after. He stalked and kept intimidating the Plaintiff.

47. The Plaintiff was told her former boss Carlos Gonzalez was allowed to be there because it was a public building and there was nothing they could do about it because he didn't work for the senate anymore.

48. January 30, Carlos was waiting for the Plaintiff to come up from the garage and walked with her to her office asking if she reported him. He grabbed her arm and told her it wasn't fucking over.

49. The Plaintiff called the Sergeant at Arms that morning, had a meeting with senate officials that afternoon and then went to state police on the concourse later in the day.

50. The next day Trooper Thomas Manny told Carlos Gonzalez he could not contact the Plaintiff in any way or he would be arrested.

51. The Plaintiff started getting anonymous threats by email and telephone after that. Police said because he wasn't identifying himself there was nothing they could do.

52. The Plaintiff had proof it was him, and gave the police evidence, and the IP address of the person threatening her, but the DA wouldn't subpoena Time

Warner to connect the IP address with the computer of the person anonymously emailing the Plaintiff.

53. Carlos Gonzalez was still doing work for certain senators and incorporated himself into the Plaintiff's workflow. Police thought maybe he was still working there.

54. The Plaintiff asked the Defendant Secretary of Senate Frank Patience if he could talk to police and tell them Carlos Gonzalez is not working with the senate.

55. The Defendant Secretary of the Senate Frank Patience knew the Plaintiff was trying to get a restraining order. Carlos Gonzalez finally emailed the Plaintiff as himself, and she brought it down to the police barracks and they wrote up an incident report for Carlos Gonzalez to face harassment charges in court. That never happened. He continued to terrorize the Plaintiff in ways that she has documented.

56. The Plaintiff was throwing up daily and started getting dizzy spells and passed out a few times. The Plaintiff's doctor wanted her to find a new job or take a leave of absence. The Plaintiff agreed to see a therapist instead.

57. In 2012, the Plaintiff started seeing Dr Jacqueline Bashkoff. Carlos Gonzalez continued to show up to the Capitol every day and he would roll a suitcase around with him.

58. Speaker Silver gave Carlos Gonzalez an office a few floors above mine (yet he wasn't getting paid because the new director of my department, Eileen Miller would check the expenditure reports). Eileen Miller would block Carlos Gonzalez's attempt to gain access into our office. Carlos Gonzalez would demand it and also give the Plaintiff instructions on how to do her work — yet he supposedly didn't work for the senate anymore.

59. With no help from the senate or law enforcement, The Plaintiff carefully attempted to find an attorney and got caught in a web of conflicts and more intimidation.

60. The Plaintiff broke down at the end of this year and her doctor mandated that she take a leave (Nov & Dec) and recommended that she look for a new job.

61. The time off helped the Plaintiff's health and she wanted to go back to the senate because it was a job that she loved doing.

62. By 2013 the Plaintiff really worked on herself with her therapist but still needed closure and a reason why Carlos Gonzalez never had to answer to those charges.

63. The Plaintiff's therapist tried to help her get access to her police report — starting in July which took almost six months…. and then the Plaintiff called ADA Chantelle Cleary in Albany Co SVU September 2013 to report ███████████ ███████. It took seven months to get in to make this report and the persistence of the Plaintiff and her therapist Dr. Bashkoff.

64. It was agonizing and intimidating for the Plaintiff to also be ignored by ADA Chantell Cleary, ADA Brett Knowles, and victims advocate Tricia George in Albany County David Soares' office. She started documenting in a timeline that they would finally schedule a meeting— then reschedule over and over again…. the Plaintiff told them about serious crimes they never investigated. Between the DA and the state police, they slowly walked the Plaintiff into the ground. The Plaintiff gave up in 2016.

65. In 2017 with Met Too in motion, the Plaintiff had a story to tell. She spoke with friends about exposing the truth about what happens in New York when you try to report sexual harassment and violent sex crimes, but it would have also meant she would be exposing herself publicly. Another problem the Plaintiff thought she would have was reporting the abuse about the senate from within the senate.

66. In 2018, the Plaintiff started a new timeline of unbelievable hypocrisy and took another shot at getting justice by speaking with a reporter during the Me Too movement because Shelley Mayer who was head senate counsel and didn't help the Plaintiff in 2010, was now running for a special election seat on a platform of women's empowerment — touting a strong record of standing up for women who were sexually harassed and laws to protect them. Other advocates were echoing her record of "championing women".. That was not her record as top senate lawyer, and that was not her record as an Assemblywoman backing Assembly Speaker Silver after it was revealed he covered up sexual harassment.

67. January 10, 2018 — A former senate employee comes forward and says she was forcibly kissed by Senate IDC Leader Jeff Klein in 2015 and received the support of powerful women senators in her attempt to get justice. Senator Klein denies it. Senators Liz Krueger and Andrea Stewart-Cousins and Governor Cuomo call for an investigation.

68. January 11, 2018 — Democratic Minority Leader Andrea Stewart-Cousins said, "We need to confront sexual assault, harassment and inappropriate workplace behavior head-on and make it clear it's not acceptable." A statement like this from ASC opened the door for survivors to speak up. I was still thinking about it

69. On the same day, Jan 11, Senate Majority Leader Flanagan publicly makes a statement — the senate has no jurisdiction to investigate the Klein accusation

and adds he knows "Senator Klein to be a good and decent person who treats others with respect. We take every allegation of sexual harassment seriously and will continue to encourage everyone to come forward…" There is no process to help victims and this situation again proved it.

70. It was glaring that there is no process to help victims and this situation again proved it. The Plaintiff felt this deeply because she knew personally what it's like.

71. The Plaintiff believed since she already made several formal complaints (with the senate and state police, the Albany District Attorney's office), she could have a shot at an investigation into all the entities that covered it up.

72. March 1, 2018 — The Plaintiff attended the mandated sexual harassment training live in the hearing room and was extremely uncomfortable. It was the first live mandated harassment training seminar that she ever went to because the Plaintiff was either given special consideration because she had a doctor's note — or the ability to watch from her office desk — and she was also just given codes to fill in "as proof she watched" because their policies were contradictory to what they spoke of — and The Plaintiff's supervisors knew it and knew her triggers. But this time the Plaintiff was told she had to physically be there. The "expert" panel said things like — the harasser is liable and the employer is liable… reasonable standard… hostile work environment… All the things that should have been in place for the Plaintiff, and sort of were, but also weren't —

and that's because of the "enforcers". At this training, they spoke about pushing a new law about making "false accusations of sexual harassment".

73. At an appointment with her therapist during this time, The Plaintiff talked about telling her story to the Daily News. Dr. Bashkoff was against it because she felt it was exploitative. Her main concern was that it might open the feelings of always being watched by the Plaintiff.

74. The Plaintiff understood what she was saying, but she still got those feelings. What she was hoping for was someone being held responsible might help lessen the dread that she feels about everything.

75. The week the Plaintiff planned to meet with Daily News reporter Ken Lovett (March 16, 2018), her tire was slashed on March 13. And on March 15 the outdoor light post was vandalized at the Plaintiff's home — the glass casing it was in was dangling off its perch and the wires were yanked out.

76. While the Plaintiff was in the process of telling her story to Ken Lovett, on March 28, while on the phone working on the story, Ken Lovett was outside the Chamber and was arrested) for talking on the phone in that area) and brought to the state police barracks in the concourse. Governor Cuomo came to "bail him out" — no charges were pressed, but that certainly intimidated the Plaintiff because Ken and the Plaintiff were set to meet so she could go into more detail.

Instead of meeting, She sent him audio recordings, a timeline and other evidence to help him understand

77. The Plaintiff also contacted Matthew Kulvicki and Shana Wittenwyler to corroborate her accounts.

78. On April 4, Ken and the Plaintiff were going to meet in the concourse cafeteria to finish telling her story and Governor Cuomo calls a breaking news conference to unite Senate Minority Leader Andrea Stewart Cousins and IDC Leader Jeff Klein to form a united Democratic Conference (even though both Cuomo and ASC called for Klein to be investigated for alleged sexual advances against a staffer).

79. It was another act that intimidated the Plaintiff, but she didn't back down.

80. On April 9, the Plaintiff decided she would let Ken use her name for the story and go on the record. Shana and Matt said they would support me as well.

81. Defendant Shelley Mayer's handlers lied saying they tried to help the Plaintiff when they never did. They said they had proof, but never provided it. They said they tried to call the Plaintiff, but didn't reach her. They eventually passed the buck to Secretary of the Senate Angelo Aponte saying she told him and it was his responsibility to do something (but he retired in November).

82. The story came out April 13, 2018 and the Plaintiff felt very disgraced. Democratic Leader Andrea Stewart-Cousins did not support her. She said, "Unfortunately this is the double standard that women in the workplace face — you can stand up for victims of sexual harassment, as Shelley did, only to be shot down by men in higher-ranking positions, then you still get blamed for not doing enough". She said nothing of the actual victims — she didn't call for an investigation the way she did with the woman who accused Senator Klein of forcible kissing.

83. In a followup story, a "Cuomo source" didn't comment specifically on Mayer, (or the Plaintiff or Shana) but called it "literally laughable" that the GOP chair is hitting the governor on the issue weeks after the state "passed the strongest package on sexual harassment in the nation."

84. Many other government leaders who had spoken out against sexual harassment remained silent while Defendant Shelley Mayer's campaign continued to insist she followed proper Senate protocol by referring the matters to human resources or then-Secretary of the Senate Angelo Aponte, who wrongly refused to take meaningful action.

85. April 17, 2018 The Plaintiff filed a complaint with the Defendant Joint Commission on Public Ethics and asked for an ethics investigation.

86. Defendant Democratic Leader Andrea Stewart-Cousins' response in a story about the Plaintiff's filing of an ethics complaint, she said nothing about the victims. Defendant Andrea Stewart-Cousins' only concern was for the enabler, Defendant Shelley Mayer. "You have a woman who did what she was supposed to do and apparently her supervisor didn't do anything and now the woman is to blame. That concerns me," Stewart-Cousins said. "Shelley Mayer is a proven legislator with a great deal of intelligence, great deal of integrity and I am sure at the end of all this, she will be the next senator from the 37th district."

87. Defendant Leader Stewart-Cousins' response to the Daily News article, where the Plaintiff came forward as a survivor, was as if she didn't know her, and definitely cared only about making the pain she was exposing go away — for her own political future.

88. This is real. It doesn't go away for the Plaintiff. Our government officials were outright displaying that they don't care about those among us who have faced sexual violence unless it is a stance they can take that will benefit their political status.

89. The Plaintiff understood the reaction by the senate officials and the state of New York that it meant that her time would be up as a senate manager of a department and would most likely lose her job.

90. Political operatives were attacking the Plaintiff's character on Twitter.

91. On April 21, 2018 The Plaintiff sent an open letter to Defendant Shelley Mayer. In it she explained how the inaction by her — the top senate lawyer, someone in a position of trust, with the actual ability to help the Plaintiff — has affected her life and healing and the Plaintiff believes impacted how other authority figures responded when she went to them for help. As a public servant of the state of New York, Defendant Shelley Mayer never acknowledged the Plaintiff's letter — just like she never recognized the help the Plaintiff was asking for in 2010 was legit.

92. On April 26, 2018, In a post-election interview with Spectrum TV reporter Nick Reisman — the new senator, Defendant Shelley Mayer said it was wrong of the Plaintiff and Shana Wittenwyler to tell their stories and she's going to make changes in the policy that failed them. Defendant Shelley Mayer never took responsibility for failing victims of abuse.

93. May 1, 2018 — the Plaintiff was face to face with Defendant Senators Stewart-Cousins and Mayer at the Women Of Distinction Ceremony. The Plaintiff has hosted the ceremony since 2011. The Plaintiff was standing by one of the entrance ways when Defendant Senator Andrea Stewart-Cousins walked in right next to her. When the Plaintiff smiled and said hello, Defendant Senator Andrea Stewart-Cousins looked at her and then looked like she was going into convulsions.

94. The Plaintiff felt ashamed, uncomfortable and humiliated. A powerful woman the Plaintiff used to feel always enjoyed talking to her, was sickened by the sight of her for telling the truth about the pain she's lived with for years. Within minutes of that hurtful and confusing scene, the Plaintiff had to emcee the ceremony for accomplished women throughout the state who were chosen for the distinction of "community hero" by their senate representative. Defendant Shelley Mayer sat in eye shot of the podium where I was presenting during the hour long ceremony.

95. May 15, 2018 — The Plaintiff hosted the Senate's Veterans Hall of Fame ceremony. As the ceremony is about to begin, Senator Flanagan tells the Plaintiff I will introduce Defendant Senator Stewart-Cousins instead of him. They both made her uncomfortable at this point. Defendant Senator Stewart-Cousins was in the audience sitting next to Defendant Shelley Mayer smack dab in the Plaintiff's focal view point.

96. Again, Defendant Senator Stewart-Cousins was so uncomfortable with the Plaintiff. The Plaintiff opened the ceremony with the Pledge of Allegiance (as it was always done) then she called her up to speak. She had the fakest look on her face and told the crowd that — as she was walking up to the podium someone said to her, I thought we were starting with a prayer. Then she had a disappointed look on her face, shook her head and said ok, uhhh... but it never started that way and she made the Plaintiff feel extremely uncomfortable.

97. May 25, 2018 — Defendant Senate Democratic Leader Andrea Stewart-Cousins endorses Senator Jeff Klein for Senate against his primary opponent, Alessandra Biaggi (even though she recently called Klein out to be investigated for forcibly kissing a staffer). This is a sign to tell anyone who is suffering from an abusive work situation that it doesn't matter what you say, it's safer to stay silent.

98. Defendant Senator Andrea Stewart-Cousins decided her ascension as leader is more important than any stance she could take for assaulted and inflicted employees — and she endorsed Senator Klein for his primary race against Alessandra Biaggi.

99. Defendant Senator Andrea Stewart-Cousins said, "I am proud to support Senator Klein and endorse his re-election campaign. By working together, I know we will achieve a functioning Democratic Senate Majority and give New Yorkers the progressive leadership they deserve."

100. September 3, 2018 — Governor Cuomo is asked about the investigation into the Manhattan DA handling of Weinstein. He said it was put on pause (until after the election). This shows the depth of cover ups and collusion by Defendant the State of New York and the wrong person getting protections.

101. These people in positions of power are the ones who can make change, but they are also the ones blocking any true measure of relief. Always leaving a loophole to get out of sticky situations.

102.   September 7, 2018  the Plaintiff is asked by the senate to campaign for Senator Jeff Klein. She said she wasn't comfortable with that and was told to take the weekend to think about it.

103.   September 10, 2018, the Plaintiff declined to campaign for Senator Jeff Klein.

104.   September 20, 2018 he Plaintiff passes out at home while getting ready for work.

105.   September 24, 2018  — More hypocrisy that developed anxiety in the Plaintiff … Governor Andrew Cuomo tweets, "We owe it to the American people to Believe Survivors' ' He was talking about the Kavanaugh allegations being credible and a vote to seat Kavanaugh should be postponed. (But he said nothing like that when I spoke out about my abuse and Senate cover up.)

106.   Same day, September 24, 2018 Lt Governor Kathy Hochul sends out #BelieveSurvivors tweet "In the era of #MeToo we are the change," she says.

107.   November 6, 2018 — the senate democrats win the majority outright and the Plaintiff believes she will be out of a job soon.

108.   November 8, 2018 — Special prosecutor says disgraced AG Eric Schneiderman will not face charges for assaulting four women. Cuomo

hand-picked the prosecutor states statutes of limitations, yet why did the "investigation" take six months? It reminded the plaintiff of her experiences, especially with law enforcement and the DA.

109.   Nov 28, 2018 — Incoming leader Defendant Senator Stewart-Cousins says she is open to strengthening sexual harassment laws.

110.   December 17, 2018 The Plaintiff was told by personnel to watch ethics videos — put in codes.

111.   December 20, 2018 The Plaintiff was fired from the senate without giving a reason.

112.   As she expected, the same system that allowed all those years of pain to happen to the Plaintiff — also now fired her after she spoke out publicly about it. She was the only person in her office who was fired.

113.   Defendant Alejandra Paulino, Secretary of Senate for the new administration coming in 2019, fired the Plaintiff on what she said was her 4th day in her new role as Secretary of Senate. The Democrats were not fully in charge yet, but it was an important call of duty to take down the person who implicated a member of their conference when the Plaintiff spoke honestly about how she was treated. Ms. Paulino is also friends with the Plaintiff's abuser, Carlos Gonzalez. And when

she fired the Plaintiff, she said that she didn't have to tell her why, she also said

sorry I am an hour late, laughed, and said that she didn't just want anyone to do

it, but she wanted to do it — face to face "out of respect to me".

114.    The message was clear to me and other victims watching — it was not safe to

speak out. You aren't even protected for speaking out when doing it from within

the institution with the laws that are supposed to protect you. The Plaintiff was

told by multiple people in the senate, and assembly that she was on a list — of

employees to be fired first. She was told she was done as of January 9, 2019

Defendant Senator Stewart-Cousins's first day of power.

115.    The Plaintiff asked why I was being fired and was told they didn't have to tell

me. I asked if it was because I spoke out and she acted like she didn't know what

I was talking about.

116.    December 21, 2018, the Plaintiff contacted JCOPE again and they got back

to her right away.

117.    December 28, 2018 The Plaintiff came in on her day off to figure out what she

was supposed to do. There were no answers — the new policies weren't set up

yet. She told HR that she felt she was being fired as an act of retaliation but was

ignored. No one could tell her if she had personal time, where she was supposed

to report after the new year

118.    January 2, 2019 The Plaintiff went to HR and was told again they had not decided yet if those who are let go are entitled to personal time, so she didn't know when I should be there to continue to be paid in full, aka if I earned the personal time everyone at the beginning of the year gets — they didn't know if I'd get that yet.

119.    January 3, 2019 The Plaintiff went back to HR to try to get a solid answer about her time and spoke with Eileen in Time and Attendance about where to drop off my senate badge, parking space, etc.

120.    January 9, 2019 — The Plaintiff emailed JCOPE again saying she wanted to give them the whole story and other information. And how — the Plaintiff was unjustly fired even after making this complaint. They never responded to that email.

121.    January 9, 2019 — the Plaintiff dropped off her work passes and laptop, etc to three different buildings. She followed the protocol she was told... She brought the parking pass to Sue Ryan in the secretary of the senate's office in the Capitol. She gave the laptop to Rosanna in the Agency 4 building, and she dropped off her timesheet and ID to Eileen in personnel in the Alfred E. Smith building. (and her paycheck was still later withheld.)

122.   On this day, January 9, 2021, It was Senator Andrea Stewart-Cousins' first day as leader of the senate. She stood on the dais with all eyes on her, and lied… saying these words, "Let me make my voice clear, we need to deal with the scourge of sexual harassment in the workplace." (She took a dramatic pause, fixed her scarf, her head was bobbing, and she took deep breaths.) She continued, "We cannot let this moment and movement pass. We will hold hearings and we will hold all accountable."

123.   The plaintiff signed up to speak at the February 2019 hearing and was put way down on the list like the 30th out of 35 speakers -- and the whole thing was a circus. The plaintiff would have been speaking at about 11PM. She felt like that was abusive too, and decided not to do it -- her emotions were very ripe at that time because she was recently retaliated against and treated the way officials were saying they wanted to change.

124.   On January 11, 2019, without the Plaintiff being informed, the Defendant Joint Commission On Public Ethics met with the new Chief Senate Counsel Shontell Smith and decided to secretly throw out the complaint she filed because they said the senate has no record of what happened (the Plaintiff does) "due to the passage of time," but also included they would keep what happened to the Plaintiff in mind when drafting future legislation. They didn't inform the Plaintiff about this until March 2019 in a letter JCOPE mailed to the Plaintiff's home address. The letter from JCOPE about the complaint the Plaintiff filed was

addressed to the new senate head counsel, Defendant Shontell Smith and the
Plaintiff was merely cc on it.

125.   January 30, 2019 The plaintiff's paycheck was not in her bank account so she
called personnel. They told her there was a hold on it because I must have not
dropped everything in. The Plaintiff told them she did and they looked into it and
apologized for the oversight.

126.   March 2019 - Dealing with the impact of being wronged in so many ways, for
so long, and now having no job or ability to do much of anything but cry every
day. The Plaintiff's apple watch kept alerting her because my beats per minute
would skyrocket and then drop really low.

127.   The plaintiff knew she had to make severe changes for health reasons. She
needed to set goals and had to remind herself to move, to grow, to do something!

128.   It was devastating for the Plaintiff to have worked so hard her whole life to
learn and grow her skills, while sacrificing precious time with her son, to make big
career moves in her 20's-30s, to have her accomplishments feel so empty.

129.   For the last 20+ years the Plaintiff had been earning respect for her work ethic
and abilities as an inspired, creative professional. After she was fired, she had a
hard time recalling my achievements and projects that she had always been

proud to complete. PTSD is powerful. There truly are many achievements, but this experience of being fired after speaking out in a place that said they would protect her— had it all blurry.

130.   Financial Distress, In order for the Plaintiff to keep her same state pension that she had built for 14 years — at Tier 4 — and not lose thousands of hours of sick time she has accrued (which turns into money for healthcare after retirement) — it is required to get back into a state or a local government position within a year. The Plaintiff had until January 9, 2020 to get back in to keep her benefits intact.

131.   She passed a civil service test for young professionals in March and for months applied for the jobs they told me she was eligible to get. These are entry level jobs at state agencies, half the salary she was making — and she was never asked to interview for the positions.

132.   On the other hand, the Plaintiff had anxiety about landing an interview because she was filled with so many different emotions. She doesn't think about the senate without wanting to cry — and she will have to talk about her experiences with prospective employers in a positive way. It's a huge chunk of her career — therefore, there is no way around tackling this.

133.   The Plaintiff was at one of the lowest self esteem moments she ever felt.

134.    From April-July 2019 The Plaintiff picked herself up off the ground from depression and tried to build her confidence by getting a certification in motion graphics.

135.    To the present, the Plaintiff still has trouble sometimes with tasks, due to the neglect of her abusive past.

136.    The Plaintiff has PTSD and it's embarrassing at a new job — adrenaline rush, try not to cry, but does and then loses time just staring in outer space. It freezes her.

137.    The Plaintiff moved from seeing her therapist regularly to trying to be more proactive without having to dredge up the painful memories. The Plaintiff completed a level 1 reiki certification, does energy work, and takes a class once a week that focuses on positive affirmations.

138.    January 3, 2021 — The Plaintiff reads that JCOPE does investigate sexual misconduct after all! An article shows that JCOPE has been investigating Erica Vladimer's accusation that Senator Klein forcibly kissed her on a street outside a bar in 2015 where there were no supposed witnesses. Documents say they have enough evidence — and that they decided to open a formal investigation in February 2019. That would be a month after the Plaintiff was fired, and they decided to throw out her complaint of pervasive abuse that was ongoing — with plenty of evidence and witnesses — including from top senate authorities, and

police, but they told me they had none of that because of the passage of time. The Plaintiff was happy to see movement for Erica, but the inconsistencies in the law due to government officials' attitude towards who is deserving of justice and who is not — just has to stop.

139.   February 25, 2021  -Listening to the allegations about Cuomo spirals the Plaintiff into a dark place. She watched Lindsey Boylan make them, and then it just went away for like 2 months. This was so triggering to the Plaintiff. Cuomo himself is so triggering to her. How he dismissed the Plaintiff — how he dismissed so many others — and he's a perpetrator himself. Watching this stuff after experiencing what the Plaintiff did is painful for her.

140.   March 2, 2021 — the Plaintiff is an emotional wreck from all of the noise and abuse and hypocrisy and she cried at work in front of a colleague she barely knew. The Plaintiff takes this with her everywhere. At a diversity, equity, and inclusion Zoom workshop, the Plaintiff and her colleagues were asked to pick an identity (there was a list) and to talk about why it's been difficult and what sources of strength do you get from it, and how it impacts how you are at work. The Plaintiff froze because especially with all the Cuomo allegations and fake statements by politicians that were giving her PTSD, it was really all she could think about.

141.   The Plaintiff and coworkers got pushed out into the breakout rooms one-on-one. The Plaintiff was trying to think of something else to identify with, but

this has been consuming her. So the other woman goes first and tells a private detail about her life growing up. At the Plaintiff's turn to share she couldn't think of anything else, was so frustrated and started to cry.

142.   March 3, 2021 Defendant Andrea Stewart-Cousins comments on CNN about victims of sexual harassment and assault needing more than an apology from Governor Andrew Cuomo. Defendant Senate Majority Leader Andrea Stewart-Cousins says, "An apology is a beginning but there has to be an end to any sort of behavior like this." Btw, no one even apologized to the Plaintiff… let alone gave her closure…or even tried. Not even Defendant Senate Majority Leader Andrea Stewart-Cousins tried to answer those questions.

143.   March 4, 2021 — Capital Tonight host Susan Arbetter interviews Defendant Senate Majority Leader Andrea Stewart-Cousins to which she says she wants people to come forward and they will be supported and believed.

144.   Defendant Senate Majority Leader Andrea Stewart Cousins says: If anyone else comes forward it would be time for Cuomo to resign, New York has been really clear about any sort of sexual harassment, or anything that makes people feel uncomfortable in the workplace is really unacceptable, she says.

145.   When she was 25 years old people weren't allowed to speak up. Defendant Senate Majority Leader Andrea Stewart-Cousins also says, ``I applaud women

who have been through this, are coming forward because it is very scary sometimes. Women have been hopefully taught to come forward, and I am always happy when-when people come forward and-and I encourage them to do that."

146.   Defendant Senate Majority Leader Andrea Stewart Cousins was asked if the legislature should look into whether the governor broke the law in handling one of his accusers' claims because it appears there was never an investigation of her claims — and the law passed in 2018 states there should be.

147.   Defendant Senate Majority Leader Andrea Stewart Cousins said: certainly the attorney general's investigation will be able to uncover anything that was mishandled. (This law should have applied to the Plaintiff  — if not, why not?)

148.   Defendant Senate Majority Leader Andrea Stewart Cousins says that if anything like that happens in her office the referrals go to JCOPE and we follow the law. (but they — including Defendant Stewart-Cousins quashed my JCOPE complaint)Defendant Stewart-Cousins says they are looking into the JCOPE reforms (a constitutional amendment might not be needed, ASC says).

149.   Defendant Senate Majority Leader Andrea Stewart Cousins says, it is important to have a place where your referral will go and be handled in a way that is fair. (like the Plaintiff was asking for.

150.   It is always hard when you think that something is resolved and to find that there is still so much work to do, Defendant Stewart-Cousins says.

151.   Defendant Stewart-Cousins also says It's not about him, it's not about me, it's about the situation. It's about these women. It's about people you know, having to feel uncomfortable in the workspace. When people ask about eh-how he feels or how we, it really, really, really is about-about these women and making sure that we set a tone that you-you-you must be safe in the workplace and if you're not you must speak up and you'll be supported.

152.   The days and months after this the Plaintiff became numb. The acts that transpired with the takedown of Cuomo for his sexual harassment jumbled the Plaintiffs brain.

153.   The noise was terrible. All sides are hypocritical. It doesn't matter what was real, whatever "they" say is taken at face value. The Plaintiff's silence became quieter.

154.   There was no escape. The Plaintiff forces herself to go to sleep and has trouble getting out of bed to do the things she needs to work — and interact, and survive. The Plaintiff is a normal, hard working person. This is not hard. But it is for her.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## Employment Discrimination based on Section 1983

155.   The Plaintiff spoke publicly about a matter of public importance and believes
she was fired under retaliation for those public statements.

156.   The Plaintiff asked Defendant incoming Secretary of the Senate Alejandra
Paulino why she was being fired and was told they didn't have to tell her. The
Plaintiff asked if it was because she spoke out and she acted like she didn't know
what she was talking about.

157.   The Plaintiff tried to report retaliation to HR and was ignored. When the Daily
News article came out, the senate officials all admitted it happened to the
Plaintiff, said it was awful but they still publicly backed the senator whose job it
was to help the Plaintiff. Defendant Shelley Mayer was the senate's top counsel
at the time; she could have helped the Plaintiff and others. But she chose to be
an enabler of a predator who was a senator's son.

158.   The Defendants protected their own interests instead of following the law.

159.   The Defendants acted under the color of state law while having a continuous
practice of failing to properly investigate complaints of sexual harassment in the

senate. This was proven in January 11, 2018, when Senate Majority Leader John

Flanagan said there was no process or authority for the senate to investigate

sexual harassment. This was something the Plaintiff painfully knew from

experience and she spoke about it publicly to a reporter in a story that was

printed in the Daily News April 13, 2018.

160.    In addition, The Plaintiff's fundamental 14th Amendment rights were also

violated. The Plaintiff was denied due process and equal protection of laws.

## SECOND CAUSE OF ACTION

### Retaliation based on New York State Human Rights Law

161.    Despite the April 12, 2018 enactment of stronger sexual harassment laws,

with a clause for protection from retaliation for those who file a formal complaint,

The Plaintiff was still retaliated against, and fired, and the formal complaint she

filed was dismissed.

162.    The Defendants' tactics to deflect responsibility to the Plaintiff are blatant red

flags to anyone who is trapped in a hostile situation and needs to report abuse.

163.    Defendants aided, abetted, incited, and compelled victims of hostile work

environments to stay silent based on failing to investigate or take remedial

measures. In place of a proper investigation, the Plaintiff was retaliated against

for implicating a member of the Democratic conference in her protected activity to speak out, and was fired by that conference as soon as they had the power to do so.

164.   The Plaintiff suffered adverse employment consequences including but not limited to professional opportunities, lost wages, benefits, retirement, depression.

165.   The Plaintiff had complained about the abuse and cover-up many times since 2010 to Senate authorities, State Police, and the Albany District Attorney David Soares' office.

166.   Additionally, on April 17, 2018, the Plaintiff filed a formal complaint with the state Joint Commission on Public Ethics.

167.   In a letter sent to the Plaintiff's home address that was dated March 1, 2019, Defendant Seth Agata, the Executive Director of the Joint Commission on Public Ethics wrote to Defendant Chief Senate Council Shontell Smith. The Plaintiff received it as a CC. The letter stated that the Commission met with the staff of Defendant Chief Senate Council Shontell Smith two days after the Plaintiff was no longer working there. They dismissed the Plaintiff's complaint without an investigation citing the passage of time and personnel documentation that may be missing. For the record, the Plaintiff has that documentation and she had told that to JCOPE Investigator Patrick Coultry and Lori Donadio.

## THIRD CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

168.   As a direct consequence of the Defendants' unlawful, intentional discriminatory treatment, the Plaintiff suffered and continues to suffer emotional anguish, humiliation, depression, anxiety, lack of self confidence, and a disbelief in the system.

169.   Ignoring pleas for help from employees, like the Defendants did to the Plaintiff, fosters an environment where women and men who are the victims of such abuse don't feel safe coming forward. It emboldens abusers and creates fear and silence. The Plaintiff was speaking out about the Senate ignoring her when she was sexually harassed and stalked and the Defendants were proving her point by ignoring her again.

170.   It was the reason that compelled the Plaintiff to come forward publicly with uncomfortable statements about the handling of her abuse in the news. The Defendants deflected and downplayed the severe and pervasive situations the Plaintiff faced at work -- and Defendant Senate Leader Andrea Stewart-Cousins fabricated a story that Defendant Shelley Mayer did everything she could to help the Plaintiff. Defendant Shelley Mayer never even met with the Plaintiff who was terrorized at that point. This compounded the fear the Plaintiff had to come

forward with the sexual abuse that happened to her, but was never given a

chance. No one wanted to listen -- because no one wanted to be responsible to

do anything to the son of a senator. This impeded the Plaintiff's healing and

caused emotional distress.


171.    The discrimination and retaliation the Plaintiff faced after speaking out deters

people from getting help and justice and it ignites a culture that breeds hostility

and discriminatory and retaliatory practices. Workers see this and they don't seek

help. It's a cycle of revictimization, and as an employee of the New York State

government for nearly 14 years, the Plaintiff still experiences repeated trauma

from what she's experienced and witnessed.


### FOURTH CAUSE OF ACTION

### Defamation of Character


172.    How the Plaintiff, a senate employee was treated by Defendants Andrea

Stewart-Cousins and Shelley Mayer after publicly speaking about her complaints

about sexual harassment and the senate's handling of it, was an attack on her

character.

173.    Months before the Plaintiff made public statements, the high powered woman

senate leader, Defendant Senator Andrea Stewart-Cousins encouraged workers

to share stories of harassment to create safer work spaces. She said, "Too many

women are discouraged from coming forward because they fear not being believed and attacked."

174.   After the Plaintiff spoke publicly, she felt not believed and attacked, especially by the woman she's worked with for years at the senate. In the Plaintiff's professional role at the senate, she made videos for Defendant Stewart-Cousins, interviewed her for her local TV affiliates, cable access, and web. The Plaintiff traveled to her district over the years to interview constituents, highlight programs, charity work, and events. Off camera, the Plaintiff and Senate Leader's conversations were always light and respectful.

175.   After the Plaintiff told her story, Defendant Senator Andrea Stewart-Cousins didn't say the Plaintiff's name, and wouldn't validate her strength and courage like she did with others. In fact, Defendant Stewart-Cousins made glowing statements of an enabler of the Plaintiff's abuse, Defendant Shelley Mayer. Defendant Stewart-Cousins told the public to speak out and not fear for their jobs -- then when she became the majority leader she fired the Plaintiff. The act of firing the Plaintiff was a message that she didn't believe her.

176.   Defendant Democratic Leader Andrea Stewart-Cousins did not support the Plaintiff. She said, "Unfortunately this is the double standard that women in the workplace face — you can stand up for victims of sexual harassment, as Defendant Shelley Mayer did, only to be shot down by men in higher-ranking

positions, then you still get blamed for not doing enough". Defendant
Stewart-Cousins said nothing of the actual victims — she didn't call for an
investigation the way she had before.

177.   Defendant Stewart-Cousins lied — no one stood up for victims! How could
she have stood up for the Plaintiff if she didn't even talk to the Plaintiff once?

178.   On April 16, 2018, Someone on camera asked Defendant Democratic Leader
Andrea Stewart-Cousins if she believed the survivors (referring to the Plaintiff
and Shana Wittenwyler, who also spoke of Defendant Shelley Mayer's
mishandling of her reports of abuse) and Defendant Stewart-Cousins walked by
looking disgusted and said nothing. Senator Todd Kaminsky was also asked and
he keeps walking and says, I believe Shelley Mayer. Congressman Engel said he
didn't believe the Plaintiff and Shana Wittenwyler.

179.   The Plaintiff's character was personally attacked for telling her story by the
administration who — first, told women to speak out, yet later fired her.

180.   The Plaintiff wasn't being protected or shielded due to the trauma she
experienced.

181.   Defendant Senator Andrea Stewart-Cousins no longer would speak to The
Plaintiff in work settings. She wouldn't even look at The Plaintiff. (There are

examples where she treated the Plaintiff differently like at the Senate Women of Distinction ceremony and the Veterans Hall of Fame event.) Defendant Senator Andrea Stewart-Cousins's words and actions never defended The Plaintiff, a survivor, yet she stands up for other women for saying #metoo.

182.   What Defendant Senator Andrea Stewart-Cousins says and doesn't say and does and doesn't do during this time where she has been vocal about supporting women shows her disdain for the Plaintiff — someone with the nerve to speak out about the institution while still working for the institution.

183.   The Plaintiff was discriminated against for her protective activity of speaking about a matter that is of public importance because of the person she was speaking about.

184.   There was intent to cause harm to the Plaintiff for speaking out about their inadequacies. The Plaintiff faced purposeful discrimination — was treated differently and then fired for her protected activity, complaints about sexual harassment and discrimination.

PRAYER FOR RELIEF

WHEREFORE, upon all the facts, allegations and causes of actions set forth and alleged herein, the Plaintiff respectfully requests that the court grant the following relief against the Defendants:

a.  Grant judgment against Defendants as to each and every cause of action that violated the Plaintiff's civil rights herein alleged.

b.  Award Plaintiff all her damages for violations under Section 1983, and the New York Human Rights Law, including compensatory damages and punitive damages in an amount in excess of $75,000 to be determined at Trial

c.  Award Plaintiff compensatory damages for defamation of Character, her mental anguish, humiliation and emotional distress.

d.  Direct Defendants to pay Plaintiff punitive damages deemed sufficient to punish and deter continuation of Defendants' unlawful employment practices as well as any other damages permitted to be recovered by law pursuant to the above causes of action

e.  Award Plaintiff all prejudgment interest and post-judgment interest available under the law.

f.  Award Plaintiff such additional and further relief as this Court may deem just and proper.

DATED_____DEC 2 0 2021_____

_____

Signature of Plaintiff